IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

WILLIAM NELSON, III                                                               PLAINTIFF

v.                                                                       No. 3:18CV189-GHD-JMV

WARDEN LEPHER JENKINS
MR. DEAN, CHIEF OF SECURITY
SGT. TONYA BOYD, DISCIPLINARY HEARING OFFICER
CORRECTIONS OFFICER N. MARION
MS. DAVENPORT, DISCIPLINARY INVESTIGATOR
HAROLD TATUM                                                                     DEFENDANTS

**MEMORANDUM OPINION**

This matter comes before the court on the *pro se* prisoner complaint of William Nelson, III, who challenges the conditions of his confinement under 42 U.S.C. § 1983. For the purposes of the Prison Litigation Reform Act, the court notes that the plaintiff was incarcerated when he filed this suit. The plaintiff has brought the instant case under 42 U.S.C. § 1983, which provides a federal cause of action against "[e]very person" who under color of state authority causes the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. The plaintiff alleges that defendant Corrections Officer Nora Marion used excessive force against him and retaliated against him after he filed a prison grievance against her.[1] The defendants have moved for summary judgment; the plaintiff has not responded, and the deadline to do so has expired. The matter is ripe for resolution. For the reasons set forth below, the instant motion for summary judgment will be granted, and the case will be dismissed for failure to exhaust administrative remedies.

**Summary Judgment Standard**

---

[1] The other allegations and defendants were dismissed earlier in this case.

Summary judgment is appropriate if the "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a) and (c)(1). "The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the nonmoving party to carry its burden." *Beck v. Texas State Bd. of Dental Examiners*, 204 F.3d 629, 633 (5th Cir. 2000) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986), *cert. denied*, 484 U.S. 1066 (1988)). After a proper motion for summary judgment is made, the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986); *Beck*, 204 F.3d at 633; *Allen v. Rapides Parish School Bd.*, 204 F.3d 619, 621 (5th Cir. 2000); *Ragas v. Tennessee Gas Pipeline Company*, 136 F.3d 455, 458 (5th Cir. 1998).

Substantive law determines what is material. *Anderson*, 477 U.S. at 249. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*, at 248. If the non-movant sets forth specific facts in support of allegations essential to his claim, a genuine issue is presented. *Celotex*, 477 U.S. at 327. "Where the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 89 L. Ed. 2d 538 (1986); *Federal Savings and Loan, Inc. v. Krajl*, 968 F.2d 500, 503 (5th Cir. 1992). The facts are reviewed drawing all reasonable inferences in favor of the non-moving party. *Allen*, 204 F.3d at 621; *PYCA Industries, Inc. v. Harrison County Waste Water Management Dist.*, 177 F.3d 351, 161 (5th Cir.

1999); *Banc One Capital Partners Corp. v. Kneipper*, 67 F.3d 1187, 1198 (5th Cir. 1995). However, this is so only when there is "an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994); *see Edwards v. Your Credit, Inc.*, 148 F.3d 427, 432 (5th Cir. 1998). In the absence of proof, the court does not "assume that the nonmoving party could or would prove the necessary facts." *Little*, 37 F.3d at 1075 (emphasis omitted).

The very purpose of summary judgment is to "pierce the pleadings and assess the proof in order to see whether there is a genuine issue for trial." Advisory Committee Note to the 1963 Amendments to Rule 56. Indeed, "[t]he amendment is not intended to derogate from the solemnity of the pleadings[;] [r]ather, it recognizes that despite the best efforts of counsel to make his pleadings accurate, they may be overwhelmingly contradicted by the proof available to his adversary." *Id.* The non-moving party (the plaintiff in this case), must come forward with proof to support each element of his claim. The plaintiff cannot meet this burden with "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986), "conclusory allegations," *Lujan v. National Wildlife Federation*, 497 U.S. 871, 871-73, 110 S.Ct. 3177, 3180 (1990), "unsubstantiated assertions," *Hopper v. Frank*, 16 F.3d 92 (5th Cir. 1994), or by a mere "scintilla" of evidence, *Davis v. Chevron U.S.A., Inc.*, 14 F.3d 1082 (5th Cir. 1994).

It would undermine the purposes of summary judgment if a party could defeat such a motion simply by "replac[ing] conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888, 110 S.Ct. 3177, 3188 (1990). In considering a motion for summary judgment, a court must determine whether the non-moving party's allegations are *plausible. Matsushita, supra.* (emphasis added). "[D]etermining whether a complaint states a plausible claim is context-specific, requiring the reviewing court to draw

on its experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937 (2009) (discussing plausibility of claim as a requirement to survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6)).

In considering a motion for summary judgment, once the court "has determined the relevant set of facts and drawn all inferences in favor of the nonmoving party *to the extent supportable by the record*, [the ultimate decision becomes] purely a question of law." *Scott v. Harris*, 550 U.S. 372, 381 (2007) (emphasis in original). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on the motion for summary judgment." *Id.* at 380.

## Undisputed Material Facts[2]

William Nelson filed this *pro se* civil action on September 4, 2018, claiming the violation of his constitutional rights during his incarceration at Marshall County Correctional Facility ("MCCF") in Holly Springs, Mississippi. During all relevant times he was a post-conviction inmate in the custody of the Mississippi Department of Corrections ("MDOC") serving a life sentence for capital murder. Defendant Nora Marion at all relevant times was employed at MCCF as a correctional officer.

Nelson claims that Nora Marion used excessive force against him in an incident occurring on April 24, 2018, when she allegedly closed his hand in his cell door's tray flap and started kicking and stomping on his hand. *See* Complaint [1], at 26, 27. Nelson further claims Marion used excessive

---

[2] As the plaintiff did not respond to the instant motion for summary judgment, the court has taken the documented facts set forth in this memorandum opinion from the defendant's memorandum in support of her summary judgment motion.

force against him again on May 22, 2018, as she was escorting him from the recreation yard back to his assigned cell. *Id.*, at 7-10, 14. Mr. Nelson also claims that Marion's use of force against him in the latter incident was done in retaliation for his previously filing an administrative grievance against her. *Id.*, at 14.

Nora Marion began working as a correctional officer at MCCF in January 2018. *See* Marion Declaration, Exh. "A."[3] At all relevant times to this lawsuit, William Nelson was housed on Pod D-4, a long-term segregation unit at MCCF. *Id.*

Ms. Marion's first notable encounter with Nelson was on March 17, 2018, as she was conducting a routine count on hia zone. *See* Exh. "A." When Marion entered the zone, she announced herself as a female coming on the unit. *Id.* As she was going up the stairs to the top tier, she saw Nelson in his cell with his mirror pointed toward the stairs so that he could see her coming. *Id.* Nelson called out her name. *Id.* When she approached Nelson's door and knocked, he was sitting on the floor naked with his legs wide open masturbating. *Id.* Nelson also made vulgar sexual remarks toward Marion at that time. *Id.* She issued Nelson a rule violation report ("RVR") for inappropriate sexual activity (masturbation), and he was ultimately found guilty of the violation. *Id*; RVR No. 01700137, Exh. "B"; Incident Report, Exh. "G."

After Ms. Marion issued Nelson the RVR for inappropriate sexual activity in March 2018, he nearly always brought it up and made vulgar sexual remarks toward her whenever he saw her. *See* Exh. "B."

---

[3] The exhibits referenced in this memorandum opinion may be found attached to the defendants' motion for summary judgment.

The following day, on March 18, 2018, Nelson began threatening Marion when she came on the zone, stating: "Did you know what you did by writing me up yesterday? If I don't beat that write-up, I'm going to seriously hurt you." *See* Exh. "A." Marion then closed Nelson's tray flap and secured it. *Id.* About five minutes later, Nelson began cursing and banging on his cell door – then flooded his cell, which in turn flooded the whole zone. *Id.* Marion issued Nelson another RVR for causing damage to the property of others by causing the flood, and he was later found guilty of the infraction. *See* RVR No. 01700105, Exh. "C."

In April 2018, Marion was walking by Nelson's cell while she was conducting count, and he reached his arm through his open tray flap and tried to grab her. *See* Exh. "A." Marion kicked the tray flap closed, but it did not appear to hit Nelson's hand because he had snatched it back. *Id.* Nelson then started laughing at Marion, and she locked the flap. *Id.*

Nelson testified that as a result of this incident with the tray flap, which he says occurred on April 24, 2018, his hand became swollen. *See* Hearing Transcript, Exh. "D," at 10. Nelson's medical records from that date indicate that he had mild swelling to the top of his right hand and top of his right knuckles, but there was no redness or ecchymosis (discoloration), he had full range of motion, and his handgrips were strong and equal bilaterally. *See* Exh. "H," at 161. Nelson was referred for an x-ray and was instructed to use an ice pack and Ibuprofen 200 mg for five days, as needed. *Id.*, at 162. The x-ray conducted three days later was negative and indicated no signs of soft tissue swelling. *Id.*, at 164. Nelson testified at the *Spears* hearing that he did not require any medical treatment as a result of this incident. *See* Exh. "D," at 10.

On the morning of May 22, 2018, Marion was helping Officer Murphy conduct recreation for inmates housed on Pod D-4, including Nelson. *See* Exh. "A." At approximately 10:45 a.m., when Nelson's recreation time had ended, Murphy instructed Marion to take Nelson back to his cell while

he went to get someone else. *Id.* Following security protocol, Marion restrained Nelson, removed him from the recreation cage, and escorted him back toward the building. *Id.* Before they entered, the building, Nelson called Marion a "b****" and told her that she should come into his cell and "let me f*** you." *Id.* Nelson was supposed to walk in front of Marion, but he kept turning around and trying to jerk away from her. Nelson also told Marion he was going to get out of his handcuffs and was "going to knock your ass off." *Id.* Nelson then began trying to pull his hands out of the cuffs. *Id.* At that point, Marion grabbed the handcuffs and attempted to tighten them. *Id.* Nelson told Murphy that his cuffs were too tight, and Murphy came over and loosened them. *Id.* Marion then continued escorting Nelson toward the building. *Id.*

Before reaching the building, Nelson manipulated one of his hands out of the cuffs, turned around, and tried to swing at Marion. *See* Exh. "A." Nelson claims his hand came free from the cuffs due to Marion snatching on his arm. *See* Exh. "D," at 3. At that point, Marion grabbed Nelson, pushed him up against the fence, and held him until Murphy came over and cuffed him again. *See* Exh. "A." Marion then continued escorting Nelson into the building. *Id.*

As they entered the building from the recreation yard, Nelson slipped out of his cuffs a second time. *See* Exh. "A." Marion tried to grab the cuffs and hold his arms together, but he ran away from her and headed up the stairs to the top tier. *Id.* Marion followed Nelson up the stairs and grabbed his arm as he tried to run away. *Id.* She then took him to the ground using a soft empty-handed technique and immediately called for assistance using her radio. *Id.* Murphy and other security personnel came to the scene and helped take control of Nelson. *Id.* Nelson claims that as Marion took him to the ground, he hit his back on a portable phone that was positioned near the top of the stairs. *See* Exh. "D," at 5-6.

After Nelson was secured, he was escorted to the MCCF medical department for evaluation. *See* Exh. "A." Marion is not aware of any injuries sustained by Nelson or any of the security staff involved in this incident. *Id.*

Nelson testified that due to the tightness of the restraints around his wrists, he experienced swelling and numbness in his hands. *See* Exh. "D," at 4. He further claims he hurt his back when Marion pushed him into the portable phone on the top tier as she took him to the ground. *Id.*, at 5-6. Nelson's medical records from that date show that he had a tiny (¼ cm) abrasion to his right inner wrist and a small (1 cm) abrasion to his right outer wrist with no active bleeding present. *See* Exh. "H," at 184. The nurse applied antibiotic ointment and band-aids to the abrasions and instructed Nelson to keep them in place for the day and then wash with warm water and soap and pat dry. *Id.* Nelson did not mention anything about back pain at this visit. *Id.* Instead, the nurse noted that Nelson was "laughing and joking with [the] medical officer while being examined" and while his blood pressure was being checked. *Id.* Nelson was not prescribed any medication or x-rays at this visit. *Id.*

Marion issued Nelson an RVR as a result of this incident for disruptive behavior by the specific act of taking off his restraints and attempting to swing at her. *See* RVR No. 01843802, Exh. "E." He was ultimately found guilty.[4] *Id.*

According to Jackie Collins, the Administrative Remedy Program ("ARP") Coordinator at MCCF, Nelson did not exhaust his available administrative remedies prior to filing suit against her as to any of the claims he now asserts against Marion for excessive force. Based on Collins' review of the ARP records at MCCF and the information contained on the MDOC Offendertrak database,

---

[4] Nelson's claims related to his guilty find on RVR No. 01843802 were previously dismissed by the court.

Nelson has only submitted four grievances through the ARP process regarding his incarceration at MCCF. *See* Collins Affidavit, Exh. "F."

In MCCF-17-257, Nelson complained about officers confiscating tennis shoes on his zone during a shakedown that occurred in November 2017. *Id.* In MCCF-18-139, Nelson appealed his guilty finding on RVR No. 01700105 (issued by Marion) for damaging property by the act of flooding out his cell and others on the top and bottom tiers on his zone, which was denied. *Id.* In MCCF-18-140, Nelson appealed his guilty finding on RVR No. 01700137 (issued by Marion) for inappropriate sexual behavior, which also was denied. *Id.*

On or about June 11, 2018, Nelson submitted a grievance appealing his guilty finding on RVR No. 01843802 (issued by Marion) for disruptive behavior by the act of taking off his restraints and threatening to cause Officer Marion bodily harm. *See* Exh. "F" (MCCF-18-259). While Nelson's grievance argued that the claims against him were false, that he had been denied access to certain evidence, and that the disciplinary hearing officer was biased and should not be allowed to conduct any more of his hearings, it did not allege that Marion had used excessive force against him. *Id.* The response to Nelson's grievance by the warden addressed only the validity of the RVR on which he was found guilty and did not mention any use of force. *Id.*

According to Collins, Mr. Nelson has not filed any other grievances through the ARP process pertaining to his incarceration at MCCF.[5] *See* Exh. "F."

**Failure to Exhaust Administrative Remedies**

---

[5] There is no evidence that the unmarked documents Mr. Nelson attached to his Complaint (which he purports to be ARP requests) were ever filed through the ARP process.

The documents the parties have provided reveal that the plaintiff did not exhaust the prison grievance process as to any of his allegations before filing the instant suit. Congress enacted the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. §1997e *et seq*. – including its requirement that inmates exhaust their administrative remedies prior to filing suit – in an effort to address the large number of prisoner complaints filed in federal courts. *See Jones v. Bock*, 549 U.S. 199, 202 (2007).

Congress meant for the exhaustion requirement to be an effective tool to help weed out the meritless claims from the colorable ones:

> Prisoner litigation continues to 'account for an outsized share of filings' in federal district courts. *Woodford v. Ngo*, 548 U.S. 81, 94, n. 4, 126 S.Ct. 2378 (2006) (slip op., at 12, n.4). In 2005, nearly 10 percent of all civil cases filed in federal courts nationwide were prisoner complaints challenging prison conditions or claiming civil rights violations. Most of these cases have no merit; many are frivolous. Our legal system, however, remains committed to guaranteeing that prisoner claims of illegal conduct by their custodians are fairly handled according to law. The challenge lies in ensuring that the flood of non-meritorious claims does not submerge and effectively preclude consideration of the allegations with merit. *See Neitzke v. Williams*, 490 U.S. 319, 327, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989).
>
> Congress addressed that challenge in the PLRA. What this country needs, Congress decided, is fewer and better prisoner suits. *See Porter v. Nussle*, 534 U.S. 516, 524, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002) (PLRA intended to "reduce the quantity and improve the quality of prisoner suits"). To that end, Congress enacted a variety of reforms designed to filter out the bad claims and facilitate consideration of the good. Key among these was the requirement that inmates complaining about prison conditions exhaust prison grievance remedies before initiating a lawsuit.

*Jones v. Bock*, 549 U.S. 199, 203 (2007).

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. §1997e(a), requires prisoners to exhaust any available administrative remedies prior to filing suit under 42 U.S.C. §1983. The exhaustion requirement protects administrative agency authority, promotes efficiency, and produces "a useful record for subsequent judicial consideration." *Woodford v. Ngo*, 548 U.S.81,

89 (2006). A prisoner cannot satisfy the exhaustion requirement "by filing an untimely or otherwise procedurally defective administrative grievance or appeal" because "proper exhaustion of administrative remedies is necessary." *Woodford v. Ngo*, 548 U.S. 81, 83-84 (2006); see also *Johnson v. Ford*, 261 F. App'x 752, 755 (5th Cir. 2008)( the Fifth Circuit takes "a strict approach" to the PLRA's exhaustion requirement)(*citing Days v. Johnson*, 322 F.3d 863, 866 (5th Cir. 2003)); *Lane v. Harris Cty.Med.Dep't*, No. 06-20935, 2008 WL 116333, at *1 (5th Cir. Jan.11,2008)( under the PLRA, "the prisoner must not only pursue all available avenues of relief; he must also comply with all administrative deadlines and procedural rules"). Indeed, "a prisoner must now exhaust administrative remedies even where the relief sought – monetary damages – cannot be granted by the administrative process." *Booth v. Churner*, 532 U.S. 731, 739 (2001).

The requirement that claims be exhausted prior to the filing of a lawsuit is mandatory. *Gonzalez v. Seal*, 702 F.3d 785 (5th Cir.2012). "Whether a prisoner has exhausted administrative remedies is a mixed question of law and fact." *Dillon v. Rogers*, 596 F.3d 260, 266 (5th Cir. 2010). As "exhaustion is a threshold issue that courts must address to determine whether litigation is being conducted in the right forum at the right time, . . . judges may resolve factual disputes concerning exhaustion without the participation of a jury." *Id.* at 272. The Supreme Court has also recognized the need for a prisoner to face a significant consequence for deviating from the prison grievance procedural rules:

> The benefits of exhaustion can be realized only if the prison grievance system is given a fair opportunity to consider the grievance. The prison grievance system will not have such an opportunity unless the grievance complies with the system's critical procedural rules. A prisoner who does not want to participate in the prison grievance system will have little incentive to comply with the system's procedural rules unless noncompliance carries a sanction . . . .

*Woodford* at 95.

Mississippi Code Annotated § 47-5-801 grants the Mississippi Department of Corrections the authority to adopt an administrative review procedure at each of its correctional facilities. Under this statutory authority, the Mississippi Department of Corrections has set up an Administrative Remedy Program ("ARP") through which an inmate may seek formal review of a grievance relating to any aspect of his incarceration. This court approved the ARP Program in *Gates v. Collier*, GC 71-6-S-D (N.D. Miss. Feb. 15, 1994). *See also Marshall v. Price*, 239 F.3d 365, 2000 WL 1741549, at *1 (5th Cir. Nov. 6, 2000). On September 19, 2010, the ARP process was changed from three steps to two. *See Gates v. Barbour*, No. 4:71CV6-JAD, Doc. 1242 (N.D. Miss. Aug. 19, 2010); *Threadgill v. Moore*, No. 3:10CV378-TSL-MTP, 2011 WL 4388832, at *3 n.6 (S.D. Miss. July 25, 2011).

The two-step ARP process begins when an inmate first submits his grievance in writing to the prison's Legal Claims Adjudicator within thirty days of the incident. *Howard v. Epps*, No. 5:12CV61-KS-MTP, 2013 WL 2367880, at *2 (S.D. Miss. May 29, 2013). The Adjudicator initially screens the grievance and determines whether or not to accept it into the ARP process. *Id.* The screening phase operates as a filter – applied before the formal grievance process begins – to remove procedurally defective or otherwise invalid grievances. As set forth above, a prisoner cannot satisfy the exhaustion requirement by filing a procedurally defective grievance or appeal. *Woodford, supra.* Hence, rejection of a grievance during the screening phase terminates the grievance – and does *not* count as exhaustion of the grievance process. *See Seales v. Shaw*, No. 5:15-CV-59-KS-MTP, 2016 WL 616749, at *3 (S.D. Miss. Jan. 26, 2016), *report and recommendation adopted sub nom. Seales v. Wilkinson Cty. Corr. Facility*, No. 5:15-CV59-KS-MTP, 2016 WL 616385 (S.D. Miss. Feb. 16, 2016) (finding rejection during initial MDOC screening process not to constitute exhaustion);

*Goldmon v. Epps*, No. 4:14-CV-0112-SA-SAA, 2015 WL 5022087, at *3 (N.D. Miss. Aug. 24, 2015) (same); *see also Robinson v. Wheeler*, 338 Fed. Appx. 437 (5th Cir. 2009) (per curiam) (not reported) (upholding Louisiana initial screening provision of prison grievance process).

However, if the defects in the original grievance were minor ("technical" or "matters of form") an inmate may submit a corrected grievance within five days of the rejection:

> If a request is rejected for technical reasons or matters of form, the inmate shall have five days from the date of rejection to file his/her corrected grievance.

*See* https://www.mdoc.ms.gov/Inmate-Info/Documents/CHAPTER_VIII.pdf (last visited April 3, 2019)).

If accepted, the grievance is forwarded to the appropriate official who then issues a First Step Response to the complaining inmate. *Howard, supra.* If the inmate is unsatisfied with the first response, he may continue to the Second Step by completing an appropriate ARP form and sending it to the Legal Claims Adjudicator. *Id.* The Superintendent, Warden or Community Corrections Director will then issue a final ruling, or Second Step Response – which completes the ARP process. *Id.* Issuance of the Second Step Response is the only way to complete the grievance process. If the inmate is unsatisfied with that response, he may file suit in state or federal court. *Id.*

In this case, Mr. Nelson did not complete the grievance process regarding any of the allegations remaining in this case. Instead, he merely appealed the guilty findings on various Rule Violation Reports. As such, the instant case must be dismissed without prejudice for failure to exhaust administrative remedies.

## Conclusion

For the reasons set forth above, the motion by the defendants for summary judgment will be granted, and this case will be dismissed for failure to exhaust administrative remedies. A final judgment consistent with the memorandum opinion will issue today.

**SO ORDERED**, this, the 6th day of February, 2020.

/s/ Glen H. Davidson
SENIOR U.S. DISTRICT JUDGE